* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with modifications.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties have been correctly designated and there are no questions as to mis-joinder or non-joinder of parties.
2. This case and the parties are subject to the North Carolina Workers' Compensation Act.
3. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and the subject matter.
4. An employment relationship existed between the named employee and the named employer on or about January 7, 2003, the date of the incident which employee alleges resulted in injury to his back.
5. The defendant-employer is self-insured, and defendant Southeastern Claims Services Incorporated is the servicing administrator liable on the risk.
6. Employee's average weekly wage is $600.00 and his weekly compensation rate is $400.00.
7. Employee has not received any temporary total disability benefits to date.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty-six years old at the time of hearing before the Deputy Commissioner, and had completed the eighth grade. *Page 3 
2. Prior to the date of the alleged injury, plaintiff had worked for approximately fifteen years as a roofer for several companies, including defendant-employer. He lived independently and paid child support from his earnings. The supervisors with defendant-employer considered him to be a good employee.
3. Plaintiff has alleged that he injured his back at work on January 7, 2003, when he was pulling off a section of roof and the roof gave way, causing him to twist his back. The day before his alleged injury, he told his supervisor that he had hurt his back moving furniture the previous weekend. On the afternoon of January 7, 2003, he was involved in an altercation with a co-worker. Both employees were subsequently required to report to Barry Sugg, the vice president of operations. Despite the fact that he supposedly hurt himself at work and that, according to his testimony, the altercation was about his being in too much pain from the injury to perform his job duties, plaintiff no made no mention of an injury during the meeting.
4. Mr. Sugg suspended both employees from work for the rest of the week. When plaintiff next reported for work on January 10, 2003, he told a supervisor that he had injured his back at work on January 7, 2003. Consequently, he was sent to Greenville Health Care. A nurse practitioner examined him that day, prescribed medication for him and restricted him to light duty work, with no lifting of more than ten pounds. The company provided him with light-duty, so he continued working at that time. At the follow-up appointment on January 17, 2003, plaintiff reported sixty percent improvement in his symptoms, but on January 20, 2003, he told a physician's assistant at the clinic that he had reinjured his back. He was taken out of work for a couple of days and was subsequently referred to Dr. Reeg, an orthopedic surgeon.
5. Before plaintiff saw Dr. Reeg, he went to the emergency room at Pitt County Memorial Hospital on January 26, 2003, claiming that he had been in bed due to back pain for *Page 4 
two days. Despite his complaints, he was noted to ambulate in the hospital with no apparent signs of distress and he was in no obvious discomfort when he was examined.
6. Dr. Reeg evaluated plaintiff on February 4, 2003, and prescribed medication and physical therapy for him. The doctor also gave him work restrictions. Although the company made it clear to plaintiff that it would provide light-duty work, he stopped reporting for work and on February 14, 2003, told Dr. Reeg's physician's assistant that there was no light-duty in the roofing business. The physician's assistant ordered an MRI, which revealed degenerative disc disease at the lower three lumbar segments with disc protrusions at those levels. Dr. Reeg did not recommend surgery since plaintiff did not have radiating pain and since he was neurologically intact.
7. Plaintiff continued to complain of debilitating back pain and claimed that the pain was worsening with time. In Dr. Reeg's opinion, he was exhibiting signs of symptom magnification, so the doctor ordered a functional capacity evaluation. The evaluation was performed May 27, 2003, but, since plaintiff self-limited on eighty-four percent of the tasks involved, the results were not valid. The physical therapist indicated that the results only demonstrated what plaintiff was willing do and did not represent his maximum safe work level.
8. Dr. Reeg then released plaintiff from medical care with a five-percent permanent partial disability rating to his spine.
9. Plaintiff was subsequently evaluated by Dr. Delaney, a physiatrist, on August 13, 2003. On that occasion, he complained of severe back pain radiating to his groin, thighs and feet, and he was using a cane for balance. Dr. Delaney noted that he was quite muscular and that he had a odd antalgic gait that did not fit any of the normal patterns. There were significant inconsistencies on examination, including the fact that he had a positive supine straight leg raising *Page 5 
test at only five degrees yet had a completely negative sitting straight leg raising test and essentially every test for non-physiologic indicators of pain was positive. Although the MRI's showed degenerative changes, there was no evidence of acute trauma. With the extreme pain posturing, it was not possible to determine whether plaintiff had any real pathology. Dr. Delaney agreed that he had reached maximum medical improvement.
10. Plaintiff continued to periodically go to an emergency room for treatment for alleged back pain. He also sought treatment for mental health issues and pursued a disability claim with Social Security. From November 2003 until January 2004, he went to Dr. Macedo, a neurosurgeon, for treatment. Dr. Macedo ordered a myelogram/CT scan which did not reveal evidence of any nerve root compression, so the doctor recommended only conservative treatment. He performed an epidural steroid injection in January. Plaintiff was supposed to return to Dr. Macedo in follow-up but did not go back to the doctor until July 2005. At that time, Dr. Macedo suggested that he go to a pain clinic.
11. On August 8, 2005, Dr. Thomas, an anesthesiologist and pain management specialist, began treating plaintiff for chronic low back pain. The doctor noted that plaintiff was very resistant to examination and exhibited symptom magnification at the initial evaluation. However, since plaintiff would report at least temporary improvement from the various injections administered, Dr. Thomas was willing to accept his complaints. While plaintiff was telling Dr. Thomas of benefit, he was telling other providers that the treatment was not helping.
12. On June 14, 2006, after undergoing numerous injections by Dr. Thomas, plaintiff was reevaluated by Dr. Delaney. His presentation was again unusual, his complaints were in a non-anatomic pattern and the non-physiologic indicators of pain were all present. In view of the *Page 6 
unequivocal evidence of there being a significant behavioral competent to the complaints, Dr. Delaney was of the opinion that plaintiff had no permanent partial impairment to his back.
13. Defendants authorized and paid for some of plaintiff's medical treatment following the alleged injury but would not admit liability under the Workers' Compensation Act for an injury and would not pay compensation to him for temporary total disability. Consequently, plaintiff requested a hearing. The parties then mediated the case. Although an agreement was reached in mediation, plaintiff would not sign the compromise settlement agreement when it was prepared and raised a question as to whether he was component to enter into an agreement. Consequently, a guardian ad litem was appointed for him. Defendants moved for enforcement of the mediated settlement agreement and a hearing was held before a Deputy Commissioner solely to determine whether plaintiff was bound by the agreement reached during mediation.
14. By Opinion and Award filed by Deputy Commissioner Chapman on December 29, 2005, plaintiff was found to not have the mental capacity to enter into a valid contract. Defendants' claim for enforcement of the agreement was therefore denied. The case was then placed back on the docket for a hearing on the merits before the Deputy Commissioner.
15. Prior to the first hearing before the Deputy Commissioner, plaintiff was evaluated for the Social Security Administration by Dana Blackmer, Ph.D. a clinical psychologist. His findings were discussed in the Opinion and Award previously filed. Defendants subsequently sent plaintiff to Arne Newman, Ph.D., a clinical and forensic psychologist, who met with him on June 15, 2006, and who performed a battery of psychological tests. Dr. Newman then prepared a comprehensive and analytical report which discussed the results of the evaluation and testing.
16. Dr. Newman tested plaintiff's intellectual ability using tests which were sensitive to motivation and effort. Plaintiff's results were well below those of eight-year-old mentally *Page 7 
retarded children and adults with severe brain damage and dementia. Even assuming that plaintiff was truly mildly mentally retarded, he should have performed significantly better. In fact, he would have scored better on one test by guessing, which was further evidence that he was deliberately choosing wrong answers. He also scored so low on other tests that the results were inconsistent with his presumed level of cognition and education. However, he was quite capable of concentrating for over two hours without a break to properly complete the MMPI personality inventory, when someone of his other test scores probably would not have even understood the test. His answers on the MMPI indicated exaggerated physical and psychological symptoms.
17. Aside from the results of the psychological tests, Dr. Newman noted inconsistencies in plaintiff's history, particularly in what he could remember and what he could not remember. Dr. Newman concluded that plaintiff was exaggerating or feigning cognitive or affective symptomology so that it was impossible to accurately determine his overall intellectual ability or personality functioning. In his opinion, plaintiff could also have substance abuse issues, which he had had in the past, although he had denied recent problems. There was no evidence of drug testing at any time after the alleged injury.
18. Plaintiff's medical and psychological records, a transcript of his testimony and the raw test results from the psychological testing performed by Dr. Newman were subsequently sent for review to John Warren, Ph.D., PA, another clinical and forensic psychologist who was also a physician's assistant. Dr. Warren concurred with Dr. Newman's conclusions and was also of the opinion that plaintiff was malingering.
19. Dr. Newman's findings were also consistent with plaintiff's behavior at the hearing before the Deputy Commissioner. The Deputy Commissioner found his appearance and posture to be inconsistent with a back injury and his memory and ability to articulate answers varied *Page 8 
depending upon the circumstances. The evidence established that plaintiff has been engaging in a pattern of deception since January 2003. Considering plaintiff's lack of credibility and his intentional misrepresentation of his conditions, both physical and psychological, over the years and also considering that he complained of back pain before the alleged injury due to having moved furniture, and that he did not report a back injury when he met with Mr. Sugg regarding the subsequent altercation and he had the burden of proving his case, the Full Commission finds that plaintiff has not proven that he injured his back at work on January 7, 2003, as he has alleged.
20. Even if plaintiff had sustained a compensable injury on January 7, 2003, the Full Commission finds that plaintiff sustained no disability as a result of the injury and only required treatment for a short period afterwards. Defendants provided any necessary treatment.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The evidence of record in insufficient to show that plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer on January 7, 2003. N.C. Gen. Stat. § 97-2(6); Anderson v. Northwestern Motor Company, 233 N.C. 372 (1951).
2. Even if plaintiff had shown that he sustained a compensable injury on January 7, 2003, defendants have previously provided all benefits to which he would have been entitled under the workers' compensation act. N.C. Gen. Stat. § 97-2 et seq.
 * * * * * * * * * * * *Page 9 
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
This 15th day of October 2007.
S/______________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ BUCK LATTIMORE COMMISSIONER
 S/______________________ PAMELA T. YOUNG CHAIR *Page 1